IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| FELIX ORTIZ RIVERA, | ) | Case No. 4:12-cv-00147 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |
| | ) | |

## I.    Introduction

Plaintiff, Felix Ortiz Rivera ("Rivera"), seeks judicial review of the final decision of the Commissioner of Social Security denying his application for Supplemental Security Income benefits under Title XVI of the Social Security Act ("Act") and Disability Insurance Benefits under Title II of the Act.  This matter is before the court pursuant to 42 U.S.C. §1383(c)(3), 42 U.S.C. §405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be AFFIRMED.

## II.    Procedural History

Mr. Rivera ("Rivera") applied for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) disability on April 20, 2009.  (Tr. 99-108)  Mr. Rivera's application was denied initially on July 17, 2009 (Tr. 61-63) and after reconsideration on December 9, 2009.  (Tr. 66-72)  On December 30, 2009, Mr. Rivera requested an administrative hearing.  (Tr. 83-89)

The first hearing took place before Administrative Law Judge (ALJ) Barbara Sheehe on April 12, 2011. (Tr. 30-56)  On June 3, 2011, the ALJ issued a decision finding that Mr. Rivera was not disabled.  (Tr. 8-29)  The Appeals Council denied review, rendering the ALJ's June 3, 2011 decision the final decision of the Commissioner. (Tr. 1-5)

On January 20, 2012, Rivera commenced this action in order to appeal Commissioner's final decision. (Doc. 1)  Defendant answered and filed the transcript of the administrative proceedings on April 20, 2012. (Doc. 11 and 12)  On June 19, 2012, the parties filed a joint motion requesting that the court remand this case to the ALJ.  (Doc. 15)  The court granted the motion to remand on July 2, 2012.  (Doc. 16)

After remand, plaintiff underwent two surgeries; one on his lower back and one on his right knee.[1]  Plaintiff's medical records were updated and a second administrative hearing was conducted before the original ALJ on October 17, 2013.  (Tr. 421)  On January 10, 2014, the ALJ issued a decision finding that plaintiff was not disabled.  (Tr. 413)

On November 5, 2015, defendant filed a motion to reinstate this case directing the court's attention to the second ALJ decision and the Appeals Council's decision not to review the case as a basis for affirming the Commissioner's decision not to award benefits.  (Doc. 17)  The court granted that motion on November 13, 2015.  (Doc. 18)  Defendant filed a supplemental transcript of proceedings on December 2, 2015. (Docs. 20 and 21)  Plaintiff Rivera filed his brief on the merits on January 28, 2016 (Doc. 22); Defendant filed its brief on the merits on April 13, 2016 (Doc. 24), making the matter ripe for the court's review.

---

[1] Plaintiff's knee surgery was scheduled before but took place after the second administrative hearing.

III.    **Evidence**

    **A.  Personal, Educational and Vocational Evidence**

Mr. Rivera was born on March 25, 1982 and was 27 years old on the date he applied for

Social Security benefits.  (Tr. 106)  He has a limited education and past relevant work as a

construction worker.  (Tr. 411)

    **B.  Medical Evidence**

        **1.  Medical Records Related to Physical Impairments**

The relevant medical records can be summarized as follows.  Plaintiff presented to

Healthridge Medical Center, Inc. on October 31, 2008 with low back pain and right knee pain.

(Tr. 226)  Between October 2008 and January 2010, plaintiff sought treatment from Dr. Michael

Schultz at Healthridge Medical Center. (Tr. 226-249, 337-343)  In December 2008, Dr. Schultz

diagnosed plaintiff with lumbar sprain/strain with L5 left radiculopathy. (Tr. 233)  Dr. Schultz's

notes also state that plaintiff had undergone physical therapy in the past.  (Tr. 233) Plaintiff was

prescribed pain medication and muscle relaxants.  (Tr. 233)

In January 2009, plaintiff underwent an MRI of his lumbar spine. (Tr. 235)  The January

6, 2009 physician's notes from Healthridge Medical Center, Inc. interpret the MRI results as

showing a disc extrusion at L5-S1 with nerve root irritation. (Tr. 237)  Plaintiff continued

treatments through April 27, 2009 but received little relief from Vicodin and two epidural steroid

injections.  (Tr. 246)

In May 2009, Dr. Schultz referred plaintiff to neurologist, Brian Brocker, M.D. (Tr. 269)

Dr. Brocker listed plaintiff's diagnosis as disc herniation at L5-S1 with left S1 symptoms.  (Tr.

270)  Dr. Brocker reviewed plaintiff's MRI and noted that it clearly documented a "small disc

herniation."  He further noted that the herniation "abuts but does not appear to compress the

3

descending S1 nerve root."  Dr. Brocker recommended continued non-operative management

because plaintiff was "so young and [had] no neurologic deficit." (Tr. 270-1)

Dr. Schultz's notes from January 19, 2010 state that plaintiff is "kind of a difficult

patient," and that he "didn't follow through before." (Tr. 339)  Dr. Schultz further notes that

plaintiff had seen Dr. Brocker who didn't recommend back surgery. (Tr. 339)  However, Dr.

Schultz's notes indicate:

> I think he needs to consider surgery.  He's on Prozac, Tylenol.  I gave him
> Decadron .75 mg 1 tablet QID x4 days, Cataflam 50 mg BID.  We told him if he
> doesn't get better, he's to return.  He needs a referral to a specialist if he decides
> to have surgery.  If he doesn't decide to have surgery, there is no sense in sending
> him to a specialist. (Tr. 339)

Dr. Schultz's diagnosis was revised in January 2010 to lumbar back pain, lumbar disc disease

with radiculopathy left side consistent with MRI and dorsal back pain.  (Tr. 339)

Plaintiff presented to Dr. Brocker in March, June and December of 2010.  During these

visits, plaintiff continued to complain of increased low back pain that radiated into his groin and

legs.  (Tr. 347, 348, 349)  Plaintiff also complained of difficulty sleeping. (Tr. 347, 348, 349)

Plaintiff reported that physical therapy had worsened his symptoms.  (Tr. 347)  Dr. Brocker

prescribed pain medications but did not recommend surgery for plaintiff.  (Tr. 347)  Dr.

Brocker's notes state that surgery should be considered only if more conservative measures

failed to provide any significant relief of pain. (Tr. 348-9)

Plaintiff began seeking medical treatment from Nanette Vandevender in October 2010.

(Tr. 318)  Office notes from his first visit state that he was "discharged from previous clinic

Health ridge after having a negative drug screen – and was told obviously he wasn't taking his

medications – which he states he was." (Tr. 318)

4

In January 2011, plaintiff presented to Dr. Vandevender with left carpal tunnel symptoms.  (Tr. 353-354)  An EMG study of plaintiff's upper extremities showed very mild left carpal tunnel syndrome with no electrodiagnostic evidence of motor radiculopathy.  (Tr. 356)  X-ray images taken of plaintiff's cervical and thoracic spine and his right shoulder in January 2011 returned normal results. (Tr. 359-361)  These images were unremarkable for any arthritic or degenerative changes. (Tr. 359-361)

On March 24, 2011, plaintiff presented to Dr. Vandevender requesting a note stating that he was unable to work off his state benefits.  (Tr. 376)  Dr. Vandevender's notes state that plaintiff had decent range of motion and symmetrical muscle strength reflexes. (Tr. 376-377)  She also noted that she "discussed with patient expect he can do something minimal to help work off benefits similar as last visit discussion." (Tr. 377)  She then prepared a letter stating that plaintiff was under her care and was "unable to work in a light duty employment capacity."  (Tr. 378)

On April 15, 2013, plaintiff presented to Kene Ugokwe, M.D. and complained of chronic back pain. (Tr. 762-763)  Dr. Ugokwe's physical exam revealed normal strength and reflexes, normal muscle tone, coordination and gait.  (Tr. 762-763)  Dr. Ugokwe observed that plaintiff had decreased sensation to light touch in the left S1 area.  (Tr. 763)  Dr. Ugokwe recommended that plaintiff undergo surgery, which he did on April 16, 2013.  Plaintiff's surgery went well with no complications and he was discharged on April 18, 2013.  (Tr. 761)

Following his surgery, in May 2013, plaintiff reported decreased pain in his lower back. (Tr. 876)  In July 2013, plaintiff went to the emergency room because he was feeling anxious and had run out of Xanax.  A review of his systems reported that he was negative for back pain and arthralgias. (Tr. 801)  On July 10, 2013, plaintiff presented to Heather Snyder, PA, for a

post-operative follow up.  During this visit, plaintiff admitted he was having mild back pain which was relieved with medications.  He stated that he was glad that he had the surgery. (Tr. 812)

Following plaintiff's back surgery, he reported increased pain in his right knee. (Tr. 812) An MRI of plaintiff's right knee performed on August 16, 2013 revealed an extensive tear of the medial meniscus.  (Tr. 804)  Plaintiff underwent knee surgery on October 22, 2013 without complications. (Tr. 868)  There are very few records following plaintiff's knee surgery which post-dated his second administrative hearing. (Tr. 867)  From the limited record submitted, it appears that plaintiff's knee was healing following the surgery.  (Tr. 867)

### 2.  Medical Records Related to Mental Impairments

Plaintiff presented to PsyCare on February 24, 2009. (Tr. 618-620)  Plaintiff reported feeling depressed and anxious.  (Tr. 618)  He reported an onset of symptoms three years ago when he discovered his wife cheating on him.  (Tr. 618)  He had not received any mental health care or psychotropic medication until February 2009.  (Tr. 618)  He was diagnosed with major depression, single, severe, with psychotic features and assessed with a Global Assessment of Functioning (GAF) score of 42.  (Tr. 620)

Plaintiff presented for psychiatric evaluation on March 3, 2009 due to his self-reported severe anger management issues.  (Tr. 257)  He reported to Nurse Cynthia Pulliam that he had recently moved to the United States to get away from problems in Puerto Rico. (Tr. 257)  He reported feeling depressed and anxious. (Tr. 257)  He also reported hearing walking in his house and seeing shadows. (Tr. 257)  Ms. Pulliam observed that plaintiff's mood was angry and labile. (Tr. 260)  She noted that his attention and concentration were impaired; his judgment, insight and intelligence were fair; and his thought content was below average. (Tr. 260-261)  Plaintiff

6

was diagnosed with bipolar disorder, not otherwise specified, and chronic back pain.  (Tr. 260)
He was assessed a GAF score of 49, which indicated serious symptoms and was advised to
continue individual psychotherapy.  (Tr. 261)

Plaintiff returned to PsyCare in January 2010, after a four-month absence.  (Tr. 313-314)
He reported experiencing symptoms of depression, anxiety and impaired anger management. (Tr.
313)  He denied suicidal or homicidal ideations but reported problems with sleeping and
increased paranoia.  (Tr. 314)  His depression score had increased from a 26 to a 35, signaling
severe depression.  (Tr. 314)  The counselor recommended that plaintiff continue individual
counseling/psychotherapy once per week. (Tr. 314)

Plaintiff continued to receive care at PsyCare through at least September 2011.  (Tr. 325-
334, 364-70, 600-609)  During these treatments, plaintiff's mood was documented as either
labile or varied, his affect was reactive, and his attention and concentration were often impaired.
(Tr. 325-334, 600-609)  His attire was appropriate, his behavior was generally normal and his
thought process was typically logical.  (Tr. 325-334, 600-609)  Plaintiff did not report suicidal or
homicidal ideations.  (Tr. 325-334, 600-609)  His treatment involved continued therapy and
medication.  (Tr. 325-334, 600-609)

In January 2011, plaintiff went to PsyCare for medication management and a follow-up
appointment. (Tr. 610-611)  He told Rajendra Koirala, M.D. that he had bipolar and anxiety
disorder.  (Tr. 610)  His mental examination was unremarkable and he was assessed with a GAF
score of 59.  (Tr. 610)

In April 2011, plaintiff received a new treatment plan and revision.  (Tr. 364-70)  The
treatment plan notes that plaintiff was not consistently attending his treatment and that he would
benefit from sessions two times per month but would only agree to monthly sessions. (Tr. 365-

66) Nurse Pulliam's notes from April 2011 state that plaintiff was unable to work at that time. (Tr. 606)

In July 2012, plaintiff went to the emergency department complaining of anxiety.  (Tr. 786)  He reported wanting to hurt himself and admitted he was having ideas of suicide.  (Tr. 786)  He also complained of chest tightness and palpations after taking two Xanax.  (Tr. 786)  Plaintiff stayed at the emergency department for several hours.  (Tr. 789)  His symptoms were documented as significantly improved and when discharged he was not having any chest pain or homicidal or suicidal ideation.  (Tr. 789)

Plaintiff returned to the emergency department in September 2012 complaining of anxiety again.  (Tr. 791)  He denied experiencing any other symptoms bur reported a history of panic attacks.  (Tr. 791)  Plaintiff denied any homicidal or suicidal ideations.  (Tr. 791)  Plaintiff's medications were reviewed and he was discharged no longer feeling distressed or anxious.  (Tr. 792)

### C.  Plaintiff's Function Report

At the request of the agency, plaintiff provided information about his ability to perform daily and social activities.  (Tr. 163-170)  Plaintiff reported that he helped his girlfriend take care of their children. (Tr. 164)  He did not have any difficulties taking care of his personal needs and he prepared meals on a daily basis.  (Tr. 165)  Plaintiff claimed that he had difficulties with bending but reported that he was able to clean the car and estimated that it took him an hour and a half to clean it. (Tr. 166)  Plaintiff reported going outside almost every day and that he drove a car.  (Tr. 166)  He also shopped in stores once a month for two hours at a time, watched television, played video games and spent time with friends.  (Tr. 166-167)  Plaintiff said his anger caused him to have problems with others but that he got along with authority figures "ok"

8

and had never been fired or laid off from a job because of problems getting along with others. (Tr. 167-169)  However, he reported that he was "not too good" at following spoken instructions or handling stress. (Tr. 167-69)

### D.  Opinion Evidence

#### 1.  Treating Psychiatrist – Ronald Yendrek, D.O. – May 2009

On May 12, 2009, Ronald Yendrek, D.O., plaintiff's psychiatrist, signed a mental status questionnaire, which may have been completed by Nurse Cynthia Pulliam, who also signed the questionnaire.  (Tr. 251-253)  The questionnaire reported that Dr. Yendrek had been treating plaintiff since March 3, 2009 and that he was last seen on May 12, 2009.  (Tr. 251)  Dr. Yendrek noted that plaintiff had social anxiety and paranoia.  (Tr. 252)  He concluded that plaintiff was limited in all functional areas and would not do well in stressful situations because he would overact and make mistakes.  (Tr. 252)

#### 2.  Cynthia Pulliam, Nurse – May 2009

Ms. Pulliam completed a daily activities questionnaire on May 12, 2009.  (Tr. 254-55)  She opined that plaintiff's ability to engage in daily activities was intact but noted that plaintiff's medications and his mood/thought disorder might prevent him from working. (Tr. 254-55)

#### 3.  Dr. Nanette Vandevender – March 2011

On March 23, 2011, at plaintiff's request, Dr. Vandevender prepared a letter stating that plaintiff was under her care and that he was "unable to work in a light duty employment capacity."  (Tr. 378)

#### 4.  Consulting Psychologist, John J. Brescia, M.A. – June 2009

On June 12, 2009, John J. Brescia, M.A. examined plaintiff at the request of the state agency.  (Tr. 274-283)  Mr. Brescia asked plaintiff why he was disabled and plaintiff said he had

a bad disc in his back.  (Tr. 275)  Plaintiff also reported that he got "real nervous." (Tr. 276)  He

told Mr. Brescia that he took medication and had been receiving outpatient treatment at PsyCare

for the past three to four months but had never been hospitalized for psychiatric reasons. (Tr.

276)  Plaintiff said he did not abuse drugs or alcohol but admitted that, at one point, he was

smoking marijuana "almost every day." (Tr. 276)

      During the examination, plaintiff exhibited a tense and uncomfortable demeanor but there

were no signs of anxiety. (Tr. 279)  Plaintiff said that he had been violent in the past and had

thoughts of hurting others.  (Tr. 278)  He also reported that he was prone to crying spells when

he fought with his girlfriend or was missing his family in Puerto Rico. (Tr. 278)  When

questioned about his cognitive functioning, plaintiff told Mr. Brescia that he frequently forgot

things. (Tr. 280)  He displayed below average cognitive functioning in the areas of knowledge,

general facts, quantitative reasoning and commonsense reasoning and weak knowledge in the

areas of word meanings and ability to discern the similarity between related objects and

concepts. (Tr. 282)  When asked about his activities of daily living, plaintiff said he spent most

of his time playing video games or with his children.  (Tr. 281)  He also said that he occasionally

did chores, listened to music, watched television, drove and sometimes went shopping. (Tr. 281)

Plaintiff also stated that he enjoyed cooking.  (Tr. 281)  Mr. Brescia noted that plaintiff was

exhibiting moderate to serious functional impairment, with a GAF score in the 50 to 60 range.

(Tr. 282)  He assessed plaintiff with a GAF score of 50, which was the lower of the two scores

and noted that he had moderate limitations in his ability to relate to others, his ability to

understand, remember and carry out tasks, his ability to maintain attention, concentration,

persistence and pace to perform routine tasks, and in his ability to withstand stress and pressures

associated with day-to-day work activity.  (Tr. 283)

### 5.  Reviewing Psychiatrist, John Waddell, Ph.D. – July 2009

In July 2009, John Waddell, Ph.D., reviewed plaintiff's mental health records, including Mr. Brescia's report.  (Tr. 284-301)  Dr. Waddell noted that plaintiff lived with his girlfriend and three children, played video games, occasionally did chores, cooked on a daily basis, listened to music, watched television, drove and sometimes went shopping. (Tr. 300)  Dr. Waddell also noted that plaintiff had friends in Puerto Rico and Ohio, went outside every day and went out alone.  (Tr. 300)  Dr. Waddell gave weight to Mr. Brescia's report and noted that it was consistent with a report from PsyCare. (Tr. 300)  Dr. Waddell opined that plaintiff could perform simple tasks with no rapid or consistent pace, simple social interaction and no interaction with the public. (Tr. 300)

### 6.  Reviewing Psychiatrist, Alice Chambly, Psy.D. – July 2009

On October 26, 2009, Alice Chambly, Psy.D., reviewed plaintiff's records and affirmed Dr. Waddell's findings. (Tr. 310)

### 7.  Reviewing Physician, W. Jerry McCloud, M.D. – July 2009

On July 16, 2009, an agency medical consultant, Dr. W. Jerry McCloud reviewed plaintiff's records and opined that plaintiff could occasionally lift and/or carry up to 20 pounds; could frequently lift and/or carry up to 10 pounds; could stand, walk and/or sit for about six hours in an eight-hour work day; and was unlimited in his ability to push and/or pull.  (Tr. 303)  Dr. McCloud opined that plaintiff could occasionally climb ramps and stairs, balance and crouch, but could never climb ladders, ropes or scaffolds. (Tr. 304)  Dr. McCloud believed that plaintiff has no limitations in his abilities to manipulate items, no visual limitations, no communicative limitations, and no environmental limitations. (Tr. 305-306)

11

### 8.  Reviewing Physician, Gerald Klyop, M.D. – December 2009

On December 8, 2009, Gerald Klyop, M.D. reviewed plaintiff's records and affirmed Dr. McCloud's findings. (Tr. 311)

### E.  Testimonial Evidence

#### 1.  Plaintiff Felix Ortiz Rivera's Testimony

##### a.  April 12, 2011 Hearing

The first hearing related to the present social security appeal was held on April 12, 2011. Plaintiff testified that he was born on March 25, 1982 in Fajardo, Puerto Rico.  (Tr. 34)  He testified that he could read and write in Spanish.  (Tr. 35)   He stated that he last worked for a month or two as a roofer in 2007 or 2008.  (Tr. 35)  While he lived in Puerto Rico, he worked at construction and other jobs that required heavy, physical labor.  (Tr. 35)  He also worked with farm animals.  (Tr. 36)  In Puerto Rico, he went to school through the eighth grade.  (Tr. 36)  He was unable to pass the GED test. (Tr. 36)

Rivera stated that he has been unable to work since November of 2008. (Tr. 42)  When asked what prevented him from working, he stated that he had a lot of back pain that travelled to both knees and sometimes into his testicles.  (Tr. 36)  He stated that he has had back pain for almost nine years. (Tr. 37)  He had not worked anywhere since November 2008. (Tr. 37)  He described the pain as being in his lower back around the belt level and radiating to the back of his legs. (Tr. 37)  Mr. Rivera said his pain was increasing.  (Tr. 37)  He testified that he could not stand for long periods of time because he experienced weakness in his feet.  (Tr. 38)

Rivera stated that Dr. Shultz referred him to Dr. Brocker.  (Tr. 38)  It was Dr. Brocker who found the herniated disk. (Tr. 38)   Rivera stated that no one had recommended surgery because he was too young. (Tr. 38)  He testified that Dr. Vandevender ordered a bone scan that was done at Northside Hospital.  (Tr. 38)  According to Rivera, the results of the bone scan

12

revealed that he had a possible fracture in his left leg and he was told to undergo an MRI but had not yet scheduled one as of the time of the first hearing. (Tr. 39)

Rivera testified that he suffered from depression because of his back which also prevented him from working. (Tr. 39)  He was also depressed because he could not play with his children due to back pain. (Tr. 39-40)   If he lifted his children, he experienced a lot of back pain. (Tr. 40)   He stated that he had attempted suicide two or three times while in Puerto Rico because he could not do the things he used to do such as work. (Tr. 40)  Rivera sought treatment from PsyCare for his depression and nerves. (Tr. 41)  He also saw Dr. Brocker and Dr. Vandevender; Dr. Vandevender gave him medication for his nerves and Dr. Brocker treated Rivera for problems with self-control and acting out or responding to people. (Tr. 41)  Rivera testified that his medications helped him to relax.  (Tr. 42)

When questioned by the ALJ, Rivera testified that he lived in Youngstown with his girlfriend and three daughters: ages nine, seven and two.  (Tr. 43)  He had a driver's license but it was suspended because of a ticket. (Tr. 43)  However, he testified that he had driven to the hearing. (Tr. 44)  He stated that he also drove to church services three times per week. (Tr. 44)  He denied any drinking, smoking or use of street drugs.  (Tr. 44)  Rivera testified that he last used marijuana almost a year ago. (Tr. 44)

On an average day, Rivera described the pain level in his back as an eight on a scale of one to ten, with ten being the most severe. (Tr. 45)  He said that taking medications helped his pain a little bit. (Tr. 45)  He testified that the longest he could sit before having to move around was about a half hour.  (Tr. 45)  He could walk for 15-20 minutes before having to stop and he could stand for 15-20 minutes before having to sit down.  (Tr. 45-46)   Rivera testified that he could not lift more than ten pounds. (Tr. 46)  He also said that he could climb stairs. (Tr. 46)

13

On a typical day, Rivera woke up at nine and watched his youngest child. (Tr. 47)  Rivera stated that he was able to cook, would sometimes sweep the floor, shopped for groceries once a month and helped with laundry. (Tr. 48)  He stated that he liked to watch movies and was able to pay attention to the movies even if he had seen them before. (Tr. 48)   Mr. Rivera saw his friends at his house almost every day because they lived in the same complex. (Tr. 49)  Rivera stated that he and his friends would talk or play military videogames. (Tr. 49)  Rivera did not have family living near him except his brother.  (Tr. 49)

The ALJ asked Rivera why, considering the pain in his back, he would leave his family and support system to come to the United States.  (Tr. 54)  Rivera responded that he did not have the same type of medical facilities where he lived and his back pain had not been as severe when he came to the United States.  (Tr. 55)  Rivera also testified that he had come to the mainland because he was worried about the safety of his girlfriend and daughters.  (Tr. 55)

### b.  October 17, 2013 Hearing

Upon remand by joint request of the parties, a second hearing was held on October 17, 2013.  Plaintiff testified again at this hearing and some of his testimony was repetitive of his testimony at the first hearing. He affirmed that he could read and write in both Spanish and English.  (Tr. 427)   While he was in Puerto Rico, he did construction work on houses or pools. (Tr. 427)  He was on his feet all of the time during that work and would lift as much as 80-100 pounds.  (Tr. 427)  When he came to the mainland, he worked as a roofer which included duties such as picking up trash, carrying shingles, and putting down black paper on roofs. (Tr. 428) That job also required him to be on his feet a lot. (Tr. 428)  He was required to lift a bundle of shingles weighing approximately 80 pounds and carry them up a ladder.  (Tr. 428)  Rivera had

not worked anywhere since 2008 because of his herniated disc and other back problems. (Tr. 428)

Rivera testified that he had treated with Dr. Brocker, a neurologist, for his low back since 2008.  (Tr. 429)  Rivera stated that he also had right knee problems that interfered with his ability to work. (Tr. 429)  He testified that Dr. Stanich was planning to perform surgery on his knee on October 22, 2013.  (Tr. 430)  The problem with his knee developed after the surgery he had on his lower back. (Tr. 430)  Rivera stated that the surgery was originally scheduled for September but had been postponed until October due to several infections. (Tr. 430)

Rivera testified that he had a lot of pain in his lower back that radiated down both of his legs and sometimes into his testicles.  (Tr. 431)  It also affected his walking.  (Tr. 431)  From 2008 to 2013, Dr. Brocker treated Rivera with physical therapy and medication.  (Tr. 431)

Rivera underwent low back surgery on April 16, 2013.  (Tr. 431)  Dr. Ugokwe from St. Elizabeth Hospital recommended that he have the surgery. (Tr. 432)  During the surgery, the doctor removed a disc and put in artificial bones as well as two plates and four screws.  (Tr. 432) Rivera testified that the surgery had not helped with the pain or stability but that, with medication, his back pain was better than it had been before the surgery. (Tr. 433)

Rivera testified that he had also had depression and anxiety since 2008.  (Tr. 433)  He had initially treated with someone at PsyCare, but had started going to Turning Point because it was closer to his house.  (Tr. 434)  He continued to seek treatment for his anxiety caused from the pain.  (Tr. 434)  He testified that he has not been pain-free since 2008.  (Tr. 435)  He testified that there has not been a time that he had been totally without depression or anxiety since 2008. (Tr. 435)  Rivera was taking Ultram and narcotics for pain and Xanax and Cymbalta for depression and anxiety.  (Tr. 435)  The Xanax and Cymbalta were prescribed by a doctor at

15

Turning Point and the Ultram and narcotics were prescribed by Dr. Brocker.  (Tr. 436)  Rivera stated that Dr. Brocker had not indicated whether there was anything else that could be done to help him.  (Tr. 436)

As of the second hearing, Mr. Rivera lived with his wife and four children: ages 11, 8, 4 and 2 years old.  He was 5'10" and weighed 189 pounds.  (Tr. 436)  He testified that he is left-handed. (Tr. 437)  A friend had driven him to the hearing because his driver's license was suspended. (Tr. 437)  Rivera testified that he does not drink or use street drugs.  He also stated that he had not used marijuana for three or four years. (Tr. 437)

Mr. Rivera testified that he could sit for 30 minutes before he had to get up and he could stand for 20 minutes before he had to sit down or walk. (Tr. 437)  He was able to walk for 10 minutes before he had to stop.  (Tr. 438)  He stated that he could lift and carry 10 pounds.  (Tr. 438)  On an average day, Rivera assessed his pain level as an eight (on a scale of 1 to 10, with 1 being little pain).  (Tr. 438)  Regarding his depression, Rivera testified that he felt sad, like he wanted to cry, and did not want to do anything.  (Tr. 438)  He also stated that he did not go out too much and stayed home nearly every day.

Rivera testified that he could get along with people a little bit.  (Tr. 438)  He testified that back in 2011 or 2012, while having a welcoming party for his newborn son, a guy was drunk and doing drugs at his house and Rivera had someone tell this guy to leave. (Tr. 439)  The guy left, but returned 20 minutes later to fight Rivera. (Tr. 439)  Rivera stated that the guy threw a punch at him and Rivera fought back to defend himself. (Tr. 440)  Rivera's back condition worsened after the fight.  (Tr. 440)

On an average day, Rivera testified that he got out of bed around 10:00 or 11:00. (Tr. 440)  He did not clean or cook, but sometimes watched television or read.  (Tr. 441)  He stated

16

that he did not get together with family because there were too many family problems. (Tr. 441)
Rivera said he went to church services on Tuesdays, Wednesdays, Thursday and Bible study on
Saturdays. (Tr. 441)  He was able to go to the grocery store once a month and used a handicap
cart while he was there. (Tr. 441)

### 2.  Vocational Expert's Testimony
#### a.  April 12, 2011 Hearing

Vocational Expert ("VE"), Lynn Smith, testified at the hearing.  (Tr. 50-55)  At the first
hearing, the VE considered plaintiff's past relevant work to be that of a construction worker.
(Tr. 50)

For the first hypothetical question, the VE was instructed to consider a hypothetical
individual with the same age, education and work experience as Mr. Rivera.  She was asked to
further assume that the individual was restricted to lifting and carrying five pounds frequently
and ten pounds occasionally; could sit for six hours during the course of an eight-hour day and
could stand and/or walk for two hours.  The hypothetical individual could never climb ladders,
ropes or scaffolds but could occasionally climb ramps and stairs, stoop and crouch.  The
individual was further limited to simple, routine tasks that could be learned in 30 days or less and
did not require a rapid or consistent pace.  Additionally, the individual could not work in or with
the public.  The individual would be limited to superficial interaction with supervisors and
coworkers.  The hypothetical individual would also have the following limitations: low-stress
tasks, meaning no high production quotas such as piecework or assembly line work, strict time
requirements, arbitration, negotiation, confrontation, directing the work of others or being
responsible for the safety of others. (Tr. 51)

The ALJ asked the VE if the hypothetical individual could perform any of the past jobs of Mr. Rivera. (Tr. 51) The VE stated that such an individual could not perform the past relevant work of Mr. Rivera and that there would not be any transferable skills with this residual functional capacity. (Tr. 51)

However, the VE opined that the hypothetical individual could perform the following sedentary unskilled positions: inspector with approximately 3,500 available in the local area, 30,000 available in the State of Ohio and 670,000 available nationally; an (envelope) addresser with approximately 2,200 available in the local area, 8,000 available in the State of Ohio and 180,000 available nationally; a polisher (of eyeglasses) with approximately 3,600 available in the local area, 9,000 available in the State of Ohio and 100,000 available nationally. (Tr. 52)

For the second hypothetical, the ALJ added that the hypothetical individual required a sit/stand option for comfort. He would be off task for a minute or two while changing positions. (Tr. 52) The VE stated that this hypothetical individual could perform the polisher and inspector positions but could not perform the envelope addresser position. (Tr. 52) Additionally, the VE stated that such a hypothetical individual could also perform the position of ticket checker with approximately 7,000 available in the local area, 70,000 available in the State of Ohio and 1.8 million available nationally. (Tr. 52)

For the third hypothetical, the ALJ added that the individual would be off task 20 percent of the time due to pain, difficulty concentrating and other symptoms. (Tr. 53) In response, the VE opined that there would not be any jobs available for such a hypothetical individual because of maintainability. (Tr. 53)

For the fourth hypothetical, instead of being off task 20 percent of the time, the ALJ indicated that the individual would be absent two or more days of work per month. (Tr. 53) In

18

response, the VE opined that there would not be any jobs available for such a hypothetical individual because of maintainability.  (Tr. 53)

Next, counsel for Rivera asked the VE to consider the first hypothetical above, but with the following limitations: a GAF score of no more than 50, the individual was prone to outbursts and aggressive behavior, poor judgment, moderately impaired in ability to relate to others, fellow coworkers and supervisors, moderately impaired in ability to understand, remember, and carry out tasks; moderately impaired in ability to maintain attention, concentration, persistence and pace; moderately impaired in ability to withstand stress and pressures associated with day-to-day work activity; not able to handle his own money; and not entrusted with his own checks.  (Tr. 53-54)  The VE opined that such an individual could perform some of the stated jobs, but because of maintainability, there would probably not be any jobs available. (Tr. 54)

### b.  October 17, 2013 Hearing

Vocational Expert ("VE"), Lynn Smith, testified again at the October 17, 2013 hearing. (Tr. 454)  For the first hypothetical, she was asked to assume an individual of Mr. Rivera's age, education and work experience.  (Tr. 454)  She was asked to further assume that the individual could perform sedentary exertion but would be able to lift 10 pounds frequently and 20 pounds occasionally. The individual must be allowed to change positions one time an hour, alternating between sitting and standing and could work in either position. He would need to be off-task for a minute or two while changing positions.  (Tr. 454)  Further, the hypothetical individual should never climb ladders, ropes, scaffolds or crawl but could occasionally climb ramps and stairs, balance, stoop, kneel and crouch.  This individual was further limited to simple, routine tasks that could be learned in 30 days or less and did not require a rapid or consistent pace. Additionally, this individual could not work in or have direct contact with the public.  The public

19

could be present in the workplace but this individual would not need to answer questions or otherwise interact in any way during his normal duties.  (Tr. 455)  This individual would be limited to superficial interaction with supervisors and coworkers.  The hypothetical individual would also have the following limitations: low-stress tasks, meaning no high production quotas such as piecework or assembly line work, no strict time requirements, arbitration, negotiation, confrontation, directing the work of others or being responsible for the safety of others. (Tr. 455)

The VE opined that such an individual could not return to past relevant work and that he did not have any transferrable skills.  (Tr. 455)  However, the VE stated that such an individual could perform the following jobs:  ticket checker, with 7,000 in the local area, 45,000 available statewide and 900,000 available nationally; polisher of eyeglass frames with 1,800 available locally, 5,000 available statewide and 60,000 available nationally; and a document preparer with 15,000 available locally, 75,000 statewide and 800,000 available nationally. (Tr. 456)

For the second hypothetical, the ALJ changed the weight the individual could lift to five pounds frequently and 10 pounds occasionally.  (Tr. 456)  In response, the VE stated that the individual could work the same three jobs listed above.  (Tr. 456)

For the third hypothetical, the ALJ asked the VE if there would be any jobs available if such an individual would miss two or more days of work per month due to pain.  (Tr. 456)  The VE replied that there would not be any jobs. (Tr. 457)

For the fourth hypothetical, the ALJ added that such an individual would be off task 20 percent or more of the work day.  In response, the VE stated there would not be any jobs available for this hypothetical individual. (Tr. 457)

Next, counsel for Rivera asked the VE to consider the ALJ's first hypothetical individual but added non-exertional factors of moderate impairment that included the ability to relate to

others, the ability to understand, remember and carry out tasks, the ability to maintain attention, concentration or persistence of pace, the ability to withstand stress and pressures associated with day-to-day work activity, together with poor judgment and self-control.  (Tr. 457-458)  Counsel for Rivera asked if the hypothetical individual would be able to perform the jobs listed by the VE if his impairments were to interfere with his abilities three or more times during an eight-hour work day.  The VE opined that such an individual would not be able to perform those jobs.  (Tr. 458)

In his next hypothetical, counsel for Rivera added that such an individual should not be trusted with receiving his own checks.  (Tr. 458)  The VE stated that such an impairment would not affect work ability.  (Tr. 458)  The VE added that none of the jobs she listed related to handling money.  (Tr. 459)

Lastly, the ALJ asked the VE to identify the source upon which she based her testimony. In response, the VE stated that her opinion was based on her 30 years of experience in the workforce.  (Tr. 459)

### c.  Medical Expert's Testimony

Medical expert, Dr. Arthur Brovender, testified at the October 17, 2013 hearing.  Dr. Brovender is a board certified orthopedic surgeon who reviewed Mr. Rivera's records. (Tr. 442) Dr. Brovender opined that Mr. Rivera did not meet or equal any of the impairments of Section 1.04A. (Tr. 444)  Dr. Brovender further opined that Rivera's impairments in total/combination did not equal in severity the requirements of any section of the listing. (Tr. 444)

Considering all of Mr. Rivera's retained abilities, Dr. Brovender believed that, after his arthroscopic knee surgery, Rivera could sit for six hours and could stand and walk for three hours. (Tr. 444)  Dr. Brovender opined that Rivera could lift ten pounds frequently and 20

pounds occasionally. (Tr. 444)  He also testified that Rivera should not climb ladders, ropes or scaffolds; he could occasionally balance, stoop, kneel, crouch and use stairs and ramps, but should never crawl.  (Tr. 445)  Concerning Rivera's mild carpal tunnel syndrome, Dr. Brovender opined that there would be no limitations in Rivera's ability to handle, reach, finger or feel. (Tr. 445)

Dr. Brovender believed that Rivera would be able to sit for two hours before changing positions and would be able to walk or stand for one hour. (Tr. 446)  He further opined that Rivera would not have any limitations concerning avoidance of environmental exposure such as extreme heat or cold. (Tr. 446)  The ALJ asked Dr. Brovender if the 2011 fight could have exacerbated Rivera's back condition.  (Tr. 446) Dr. Brovender said he did not know.  (Tr. 446)

Rivera's attorney asked Dr. Brovender whether the record showed that Rivera's low back injury had occurred near the time of surgery or whether it had deteriorated over a period of time. (Tr. 447)  Dr. Brovender stated that he did not know but acknowledged that the records showed that Rivera's back complaints began as early as 2008 and that his degenerative disc disease was first documented in 2010 or 2011. (Tr. 447)

Dr. Brovender was then asked about which element Rivera did not meet or equal in Listing 1.04A. (Tr. 447)  Dr. Brovender's response was that Rivera did not have nerve root compression or atrophy and did not have reflex loss. (Tr. 447)  Dr. Brovender did not look at other listings and only considered Listing 1.04A. (Tr. 448)

Rivera's attorney asked Dr. Brovender to identify the time period to which his opinion concerning Rivera's ability to sit, stand, and walk applied.  (Tr. 448)  Dr. Brovender responded that his opinion was based on Rivera's condition post-surgery but clarified that Rivera would need eight months following surgery to heal. (Tr. 448)

The ALJ asked Dr. Brovender to clarify whether his opinion of Rivera's conditions would be equivalent in severity to the requirements of any section of the listings. (Tr. 449) Dr. Brovender stated that Rivera did not meet or equal any listing from 2008. (Tr. 449) The ALJ then asked Dr. Brovender to consider exertional limitations of Rivera prior to surgery such as sitting, standing and walking. (Tr. 449) Dr. Brovender stated they would be the same as he had already testified. (Tr. 449) The ALJ asked if Rivera could do less before surgery than after he finished recovering. (Tr. 449) Dr. Brovender believed that the surgery had not impacted Rivera's abilities. Dr. Brovender pointed to records showing that, when Rivera said he was having pain in 2009, his neurological and sensory examinations were normal. (Tr. 449-450). Dr. Brovender stated that it was unusual to have pain for six years before having surgery. (Tr. 450)

Rivera's attorney asked Dr. Brovender if the medical records showed complaints of pain in plaintiff's low back as early as 2008 and if an MRI showed disc herniation in 2009. (Tr. 451) Dr. Brovender acknowledged that the records documented Mr. Rivera's complaints but noted that his motor, neurological and sensory examinations had all been normal and that the herniated disc had not been compressing or impinging a nerve at that time. (Tr. 451)

## IV.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy[2]….

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,13 claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

---

[2] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

**V.      The ALJ's Decision**

On January 10, 2014, after Rivera's second hearing, the ALJ issued a decision including

the following summarized findings:

1.  Rivera met the insured status requirements of the Social Security Act through
    September 30, 2012. (Tr. 402)

2.  Rivera had not engaged in substantial gainful activity since November 2,
    2008, the alleged onset date.  (Tr. 402)

3.  Rivera had the following severe impairments: degenerative disc disease of the
    lumbar spine, with canal stenosis, facet hypertrophy and disc herniation at the
    L5/S1 vertebral joint, status-post surgery (hereinafter, collectively lumbar
    impairment); internal derangement and medial meniscus tear of the right knee,
    status-post surgery (hereinafter, collectively, right knee impairment); bipolar
    disorder-not otherwise specified, anxiety disorder-not otherwise specified,
    mood disorder, depressive disorder-not otherwise specified, depressive
    disorder with psychotic features, personality disorder-not otherwise specified
    and cannabis abuse in remission.  (Tr. 402-403)

4.  Rivera did not have an impairment or combination of impairments that met or
    medically equaled the severity of one of the listed impairments.  (Tr. 403)

5.  Rivera had the residual functional capacity ("RFC") to perform sedentary
    work as defined in 20 CFR 404.1567(a) and 416.967(a) except that he must be
    afforded the option to sit or stand up to once per hour and although he would
    be permitted to work either position, he would be "off-task" only a minute or
    two while changing position; he may occasionally balance, stoop, kneel,
    crouch, and climb ramps and stairs.  He should not climb ladders, ropes, or
    scaffolds.  He was limited to the performance of simple, routine tasks that can
    be learned in thirty days or less, undertaken in a work setting that is low
    stress, defined as precluding tasks that involve high production quotas (such
    as piece-rate work or assembly line work), strict time requirements,
    arbitration, negotiation, confrontation, directing the work of, or being
    responsible for the safety of others, which setting is free of rapid or consistent
    pace, which setting requires no more than superficial interaction with co-
    workers and no direct contact with the public, meaning the public may be
    present in the workplace, but Rivera would not need to answer questions or
    otherwise interact in any way during the normal performance of his duties.
    (Tr. 405)

6.  Rivera was unable to perform any past relevant work.  (Tr. 411)

7.  Rivera was born on March 25, 1982 and was 26 years old, which is defined as
    a younger individual age 18-49 on the alleged disability onset date.  (Tr. 411)

8.  Rivera had a marginal education and was able to communicate in English. (Tr. 411)

9.  Transferability of job skills was not material to the determination of disability because Mr. Rivera was not disabled, whether or not he had transferable job skills. (Tr. 411)

10. Considering Mr. Rivera's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that he could perform. (Tr. 411)

Based on these findings, the ALJ determined that Rivera had not been under a disability from November 2, 2008 through January 10, 2014 (the date of the ALJ's decision). (Tr. 412)

## VI.  Parties' Arguments

Plaintiff, through counsel, filed his brief on January 28, 2016. (Doc. 22)  Initially, the court notes that plaintiff's brief does not comply with the requirements of the court's January 24, 2016 initial order.  The brief does not fully and fairly present relevant evidence with appropriate citations to the factual record.  Instead, the brief contains only vague references to the medical records and the administrative law judge's decisions.  Because of this, the court has found it very difficult to discern the precise grounds for plaintiff's appeal.

For an example of plaintiff's odd presentation of issues, the court notes that under the heading "Legal Issues," (Doc. 22, Page ID# 1379) plaintiff states:

> "[T]he question before this court is whether or not the claimant meets or equals and has met or equaled Medical Listing 1.04(A) before the Date Last Insured (D.L.I.) and, if the claimant does not meet or equal 1.04(A), what would the limitations be under applicable Social Security Regulations that would reasonable be expected to flow from [his] back condition."

Plaintiff's brief footnotes this statement of an issue with the following: "In light of the Medical Advisor's testimony at the second A.L.J. hearing, (R. 444, 447), counsel withdraws the argument that the claimant meets or equals 1.04(A) as he has no testimony to the contrary."  The

26

court finds it unhelpful, to say the least, to present an issue in the body of a brief only to waive or

withdraw the issue in a footnote.  It should probably not need to be said that issues that aren't

going to be presented need not be mentioned at all.

Later in plaintiff' brief, he represents that the "sole disputed issue in this case is whether

or not the claimant can sustain work on a full time basis so that he can engage in substantial

gainful activity."  (Doc. 22, Page ID# 1385)  Although it is difficult to discern the exact point of

that general statement, it appears that plaintiff is arguing that the ALJ failed to form a

hypothetical question to the VE that accurately reflected the plaintiff's limitations.  This

argument is not as narrowly drawn as plaintiff's counsel represents because it necessarily

involves a determination of whether the ALJ's hypothetical questions and resulting decision

were supported by substantial evidence in the record.

Defendant filed a brief on April 13, 2016. (Doc. 24)  Defendant contends that the ALJ

properly concluded that there were a significant number of jobs in the national economy that

plaintiff could perform based on his RFC and vocational profile.  Defendant argues that plaintiff

is actually challenging the ALJ's finding of RFC.  Defendant contends that the ALJ properly

considered the various medical opinions and assessed a physical RFC which was even more

restrictive than any of the medical opinions due to the fact that those opinions had been formed

before plaintiff's back surgery occurred.  Defendant argues that plaintiff has failed to challenge

the weight given to the doctors' opinions and has waived consideration of that issue.  Defendant

also argues that plaintiff has waived any arguments related to plaintiff's physical impairments.[3]

Defendant also argues that the ALJ was not required to incorporate the limitations proposed by

plaintiff's attorney at the administrative hearing and that the ALJ's failure to do so was not an

---

[3] As discussed above, plaintiff's has withdrawn any arguments related to whether plaintiff's physical
impairments meet or equal in severity Listing 1.04.  However, it is not clear whether plaintiff is waiving
all arguments related to his physical impairments as defendant contends.

error.  Defendant contends that the ALJ's hypothetical questions to the VE were substantially based on the record as a whole and that her decision should be affirmed. The court has considered the parties' arguments and its recommendations are stated below.

## VII.   Law & Analysis

### A.  Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."  *See Key v. Callahan,* 109 F.3d 270,

273 (6th Cir. 1997).  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

**B.  Whether the ALJ's Finding of Residual Functional Capacity was Supported by Substantial Evidence in the Record**

Plaintiff argues that he should have been found disabled. (Doc. 22, p.9)  He cites portions of the transcript where the ALJ questioned the VE regarding plaintiff's abilities and whether there were any jobs which he could perform with his impairments.  The undersigned is mindful that the court's review should be limited to the particular points that Mr. Rivera has raised in his brief.  See *Hollon v. Comm'r of Soc. Sec.,* 447 F.3d 477, 491 (6th Cir. 2006)  However, Rivera has made it difficult to discern the precise argument that is being asserted.  Presumably, plaintiff is arguing that the ALJ's hypothetical questions did not accurately reflect his abilities.  Thus, the undersigned will consider whether the ALJ's finding of plaintiff's residual functional capacity was supported by substantial evidence in the record. *Smith v. Comm'r of Soc. Sec.,* 482 F.3d 873, 877 (6th Cir. 2007).

The ALJ found that Rivera had the residual functional capacity to perform sedentary work with an additional allowance for his physical and mental limitations.  (Tr. 405)  This conclusion was embodied in the hypothetical questions to the VE and supported by the VE's responses.  Regarding Rivera's physical impairments, the ALJ noted that physical examinations of plaintiff reported either minimal or normal findings prior to his back surgery and that his pain was very decreased  and was controlled with medications after the surgery. (Tr. 406)  Similarly, the ALJ found that the tear of plaintiff's medial meniscus would not preclude him from all types of work and that the records following plaintiff's knee surgery showed that he was doing well. (Tr. 407)  Because the other medical opinions had been submitted before Rivera's back surgery, a medical expert was called upon to testify at the hearing.  The ALJ's finding that plaintiff had the residual functional capacity to perform sedentary work with some additional limitations was

30

even more restrictive than the medical opinions considered by the ALJ, including the board certified orthopedic surgeon who testified at the second hearing.

Regarding plaintiff's psychological disorders, the ALJ determined that Rivera's impairments did not preclude all types of work.  The ALJ cited the following portions of the record:

> Mental status examinations included in the record have consistently, albeit not universally reported either minimal or normal findings, such as one dated February 24, 2009, which indicated that the claimant presented with a sad, anxious mood, but also with appropriate dress, function, fair insight, good judgment, cooperative, appropriate behavior and no suicidal or homicidal ideation, one dated January 28, 2011 which indicated that the claimant presented with appropriate dress, good eye contact, cooperative behavior, an "okay" mood, a goal-oriented thought process, with no suicidal or homicidal ideation, no hallucinations, orientation in all spheres, with fair insight and judgment, or one dated November 14, 2013, which indicated that the claimant presented with appropriate appearance, a logical thought process and normal thought content, no psychoses, an euthymic mood, with full affect, no suicidal or homicidal ideation, cooperative behavior, adequate cognition, fair insight and judgment.
>
> The claimant follows a diminishing regimen of psychotropic medications, intended to address these impairments, with side effects generally of dizziness and drowsiness, but which the claimant concedes are at least partially effective. (Tr. 408)

The ALJ also based her finding of residual functional capacity on plaintiff's own report of his daily activities.  (Tr. 409)  Plaintiff reported being able to attend to his personal hygiene and grooming, the ability to engage in child rearing activities, to attend to household chores and automotive care, the ability to drive, to use a computer, to shop in stores, to manage his own finances, to watch movies and play video games for pleasure and to attend church as often as four times per week. (Tr. 409) The ALJ also noted that plaintiff had gone on vacation to Puerto Rico since the alleged onset date of his impairments. (Tr. 409)

The ALJ also considered the opinion evidence in finding that the plaintiff had the residual functional capacity to perform sedentary work with certain provisions.  The ALJ assigned little

31

weight to the reviewing state agency medical consultants because they reviewed plaintiff's records prior to his surgeries.  She also assigned little weight to plaintiff's treating physician, Dr. Vandevender, because her note stating that plaintiff "couldn't perform light duty work," was issued before the plaintiff underwent surgical procedures.  The ALJ afforded some weight to the independent medical expert, Arthur Brovender, M.D., who examined all of Rivera's records and testified during the hearing.  The ALJ found that Dr. Brovender's opinion was consistent with the evidence of the record as a whole.

The ALJ also considered the opinion evidence related to plaintiff's mental impairments. She assigned considerable weight to the opinions of the reviewing state agency medical consultants, John Waddell, Ph.D., and Alice Chambly, Psy.D.  (Tr. 410)  The ALJ also assigned considerable weight to John Brescia, M.A. who met with and examined plaintiff and whose opinion the ALJ found to be consistent with the overall tenor of the medical evidence of record.

The ALJ also assigned some weight to the opinion of the treating source, Dr. Ronald Yendrek, D.O.  She found that Dr. Yendrek's opinion, "although somewhat vague regarding the specific degree of functional limitation, was generally consistent with others of record."  The ALJ also considered the opinion of the non-acceptable medical source, Ms. Paschal-Pulliam. The ALJ determined that Ms. Paschal-Pulliam's opinion that the "side effects of plaintiff's medications, his mood disorder and thought disorder would prevent work activity" was inconsistent with the opinion issued by Dr. Yendrek, which Ms. Paschal-Pulliam had co-signed, and that it was inconsistent with plaintiff's own statement during the hearing that he did not experience any side-effects due to his medications. (Tr. 411)  For these reasons, little weight was assigned to the opinion of Ms. Paschal-Pulliam.

The undersigned finds that the ALJ's determination that plaintiff had the residual functional capacity to perform sedentary work with some additional provisions for his impairments was supported by substantial evidence in the record as a whole.  Because plaintiff did not argue that the ALJ improperly weighed any of the medical opinions, he arguably waived consideration of that issue.  *See Bannert v. American Can Co.,* 525 F.2d 104 (6th Cir., 1975).  Nonetheless, the undersigned also finds that the ALJ did not err in considering and weighing the medical opinions related to Mr. Rivera's physical and mental impairments.

The administrative regulations implementing the Social Security Act impose standards on the weighing of medical source evidence. *Cole v. Astrue,* 661 F.3d 931, 937 (6th Cir. 2011).  In making determinations of disability, an ALJ evaluates the opinions of medical sources in accordance with the nature of the work performed by the source. *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013).  The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

If the ALJ does not give the opinion controlling weight, then the opinion is still entitled to significant deference or weight that takes into account the length of the treatment and frequency of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. 20 C.F.R. § 416.927(c)(2)-(6).  The ALJ is not required to explain how he considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); see also *Cole*, 661 F.3d at 938 ("In addition to balancing the factors to determine

33

what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned."). "These reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (July 2, 1996)) (internal quotation marks omitted).

In deciding that Rivera has the residual functional capacity to perform sedentary work, with some additional limitations, the ALJ assigned some weight to the opinion of treating source, Dr. Yendrek.  Dr. Yendrek signed a Mental Status Questionnaire for Rivera.  (Tr. 253)  While the ALJ did not state that she gave controlling weight to Dr. Yendrek's opinion, her RFC finding did not contradict it.  Dr. Yendrek's opinion indicates that plaintiff's abilities may be "limited" in some ways, and the ALJ made provisions for plaintiff's abilities in her finding of residual functional capacity.  She determined that Rivera's work must be limited to the performance of simple, routine tasks that can be learned in thirty days or less, undertaken in a work setting that is low stress, defined as precluding tasks that involve high production quotas, strict time requirements, arbitration, negotiation, confrontation, directing the work of, or being responsible for the safety of others, free of rapid or consistent pace, no more than superficial interaction with co-workers and on direct contact with the public, and that Rivera would not need to answer questions or otherwise interact in any way during the normal performance of his duties.  Thus, the ALJ's finding of residual functional capacity is not inconsistent with the opinion of Dr. Yendrek and, although the ALJ does not state that she gave Dr. Yendrek's opinion controlling weight, she clearly considered his opinion and provided good reasons for the weight given to it.

34

Regarding the opinion of Ms. Paschal-Pulliam, the ALJ considered her opinion and provided good reasons for her failure to provide controlling weight to it.  Moreover, it is well-established that sources, such as Ms. Paschal-Pulliam, are not "acceptable medical sources." See e.g. *Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 541 (6th Cir. 2007); *Salyer v. Comm'r of Soc. Sec.,* 2012 U.S. Dist. LEXIS 108672, 2012 WL 3156986 at * 5 (S.D. Ohio Aug. 3, 2012); *Wagner v. Comm'r of Soc. Sec.,* 2012 U.S. Dist. LEXIS 102504, 2012 WL 3023266 at * 12 (N.D. Ohio July 24, 2012).  Rather, an "other source" pursuant to 20 C.F.R § 416.913(d)(1), is not entitled to controlling weight nor subject to the "good reasons" requirement of the treating physician rule. See SSR 06-03p, 2006 SSR LEXIS 5 at *4, 2006 WL 2329939 at * 2; *Everett v. Comm'r of Soc. Sec*., 2012 U.S. Dist. LEXIS 121823, 2012 WL 3731388 at * 11 (S.D. Ohio Aug. 28, 2012).  The ALJ properly points out that Ms. Paschal-Pulliam was not an acceptable medical source under 20 C.F.R § 416.1513(a); 416.908(A) but considered her opinions and determined that they were entitled to little weight.  The ALJ explained that Ms. Paschal-Pulliam's opinions were inconsistent with Dr. Yendrek's opinion and the plaintiff's own statements regarding his abilities and the side effects of his medications.  (Tr. 411)  In providing this explanation, the ALJ stated good reasons for assigning little weight to the opinion of Ms. Paschal-Pulliam even though the ALJ was not required to do so.

As to the hypothetical questions, the ALJ was only required to incorporate those limitations which she accepted as credible and which she found were substantially supported by the record as a whole.  *See Casey v. Sec'y of HHS,* 987 F.2d 1230, 1235 (6th Cir. 1993).  She was not required to incorporate unsubstantiated complaints into the hypothetical questions. *See Stanley v. Sec'y of HHS,* 39 F.3d 115, 118 (6th Cir. 1994).  The undersigned finds that the ALJ did not err in forming her hypothetical questions to the VE and she was not required to follow

the line of questioning asked by plaintiff's attorney.  The hypothetical questions which the ALJ asked the VE were supported by substantial evidence in the record. Upon review of the record and the January 10, 2014 decision of the ALJ, the undersigned recommends that the court find that the ALJ's decision was supported by substantial evidence in the record and that proper legal standards were applied.  The undersigned also recommends that to the extent plaintiff may contend that the undersigned has not accurately characterized plaintiff's arguments, such a contention should be rejected on the ground that plaintiff's brief failed to comply with the court's requirements that the factual and legal issues be presented with specificity.

## VIII.  Conclusion

In summary, the court should find that the ALJ properly considered and weighed the evidence, including the medical opinion evidence; and it should find that the ALJ's hypothetical questions to the VE were proper.  The court should further find that the ALJ's decision was supported by substantial evidence.  Rivera has not demonstrated a basis upon which to reverse or remand the Commissioner's decision.  Accordingly, I recommend that the final decision of the Commissioner be AFFIRMED, pursuant to 42 U.S.C. § 405(g).


Dated: July 21, 2016

Thomas M. Parker
United States Magistrate Judge

_____

## OBJECTIONS

Any objection to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See

*U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).